**In re GALLOWAY:**

**GALLOWAY, Appellant,**

v.

**LUCAS COUNTY CHILDREN SERVICES BOARD, Appellee.**

[Cite as *In re Galloway* (1991), 77 Ohio App.3d 61.]

Court of Appeals of Ohio,
Lucas County.

No. L–90–197.

Decided Sept. 6, 1991.

*Penny H. Nasatir,* for appellant.

*Bruce D. McLaughlin,* for appellee.

---

ABOOD, Judge.

This is an appeal from a judgment of the Lucas County Court of Common Pleas, Juvenile Division, which permanently terminated the parental rights of Patricia Walker, Theresa and Shane Galloway's mother; appellant James Galloway,[1] Theresa's father and the legal custodian and alleged father of Shane; and William Gill, also an alleged father of Shane; and granted permanent custody of Theresa and Shane to appellee, the Lucas County Children Services Board. Appellant has appealed setting forth the following assignments of error:

"1. The trial court admitted hearsay testimony of the children during the adjudication phase of the trial, thus irreparably prejudicing appellant's case.

"2. The trial court denied appellant due process of law by failing to enter judgment within seven days after the conclusion of the dispositional hearing, in violation of Juv.R. 34(C)."

The undisputed facts giving rise to this appeal are as follows. On November 21, 1988, appellee filed a complaint pursuant to R.C. 2151.03, 2151.031, and 2151.04 *et seq.*, which alleged that Theresa (born January 18, 1983) had been sexually assaulted by appellant and requested that the trial court find her to be neglected, abused and dependent and that temporary custody of Theresa be awarded to appellee for placement and planning. On November 22, 1988, appellee filed an amended complaint to correct errors and omissions in the original complaint. On November 23, 1988, appellee filed a second amended complaint which alleged that Shane (born October 20, 1981) was also neglected, abused and dependent and requested that temporary custody of Shane be awarded to it for placement and planning. On November 21 and 22, 1988, an emergency detention hearing was held, and on December 2, 1988, a judgment entry was filed which granted appellee emergency temporary custody of Theresa and Shane pending adjudication. On February 15, 1989, a case plan was filed by appellee setting forth the ultimate goal of reunification with the parent or guardian. On May 24, 1989, an amended case plan was submitted with the ultimate goal of permanent alternative placement, excluding adoption. On September 14, 1989, an additional amended case plan was submitted with the alternate goal of reunification with the parent or guardian.

---

1. Walker and Galloway were previously divorced and Galloway had custody of both Shane and Theresa.

On November 8, 1989, the adjudicatory hearing was held at which Dr. Ernesto Farrar, a pediatrician and member of the child abuse team at the Medical College of Ohio, testified that Shane had been referred to him by appellee for evaluation of possible sexual abuse and that on February 13, 1989, he had interviewed and physically examined him. Over appellant's objection the trial court permitted Farrar to testify as to the following statements made to him by Shane:

"A. When I was talking to Shane, he said that daddy had played with his no-no part and he at that time pointed to his genital area, to his penis, which he also called his pee-pee.

"Then we were also draw—using a stick figure to identify the body parts. When we—we kept on talking and he continued to say that daddy touched it with his hand and his mouth and he added to the conversation that he put it in my butt.

"When I asked him who daddy was he identified that this was his stepfather, Jim Galloway.

"Q. All right. What, if anything, happened next in the course of your evaluation?

"A. He took the stick figure and then made an X in the area that he had been touched by—with an X in the genital area on the stick figure and identified as dad."

Farrar testified that based upon this disclosure and the results of his physical examination of Shane, in his opinion Shane had been sexually victimized.

On December 1, 1989, an amended case plan was filed with the ultimate goal set forth as adoption of both Shane and Theresa. On January 4, 1990, appellee filed a third amended complaint seeking permanent custody of Shane and Theresa for adoptive placement and planning. That complaint stated that appellant was incarcerated and awaiting trial on multiple charges of sexual offenses against children, including Shane and Theresa; that psychological evaluations of Patricia Walker indicated extremely limited parenting ability with a poor prognosis for improvement, a need for drug screening and counseling, emotional and psychological instability, erratic visitation, and unstable housing; and that all of the relatives of the children had demonstrated unacceptable parenting ability with their own children or had already had unsatisfactory contacts with appellee. The complaint also joined as a party William Gill who claimed to be the father of Shane, stating that Gill had not established paternity or provided any support for Shane and that he had contacted appellee only once to indicate his interest in custody of Shane.

On February 14, 1990, the adjudicatory hearing resumed at which time Patricia Walker and William Gill both stipulated to a finding that Shane and Theresa were abused children. Appellant, however, did not consent to such a finding and the adjudicatory hearing proceeded with the testimony of Debra Smith and Sue Johnson, both clinical therapists with the East Center for Community Mental Health. Smith testified that Shane, Theresa and Patricia Walker were referred to the center by appellee and that she conducted interviews with each of them jointly and individually in order to assess their emotional status and provide psychological treatment. Smith testified that she had been involved with them from February 1989 to July 1989; that her interviews began with a social history and diagnosis; and that Shane and Theresa exhibited signs of abandonment, neglect, and abuse. Smith stated that Shane demonstrated symptoms of post-traumatic stress disorder as the result of sexual abuse and that Shane spoke of sexual abuse by his father and, during play therapy with anatomically correct dolls, brought up the topic of sexual abuse between him and his father and between him and his father's friend. Smith testified that Theresa was very angry and frightened and complained from day one that she had been sexually abused by her father and a friend of her father's and was very worried about reoccurrences. Smith indicated that the reactions she observed in Shane and Theresa were frequent and normal reactions of sexually abused children. She stated that her treatment plan for both consisted of diagnosing them as having post-traumatic stress disorder, formulating a plan of individualized treatment of play therapy for the initial period, and preparing them for group treatment for sexually abused children since that appeared to be the primary source of their conflicts.

Johnson testified that she became involved with Shane and Theresa in July 1989 when she was co-facilitating a group of sexually traumatized children of which they were a part, that she subsequently became their primary therapist and that they were still being treated. Johnson indicated that Theresa exhibited symptoms of having been sexually abused and Shane exhibited signs of abnormal sexual activity.

Also testifying at the adjudicatory hearing were Cecilie Russell and Mollie Stutz, both caseworkers employed by appellee who had been assigned to Shane and Theresa's case. The trial court permitted both to testify, over appellant's objections, as to Shane and Theresa's descriptions of sexual abuse by appellant. Russell testified that she was an investigative caseworker and sexual abuse specialist and that on November 23, 1988, she had the following conversation with Theresa:

"A. She [Theresa] began just by explaining that- -I'm going to have to look through my notes—that she wanted to tell the truth and that she stated that her daddy touched her 'no-no's'.

"* * * *

"A.   Okay.  And when I asked her what her 'no no's' were, she went on to explain that to me.  She told me that her 'do do' was her vaginal area, the 'wee wee' was the male's penis.  She said the breast area were the boobies to her, and she stated that her dad had put his 'wee wee' in her 'do do'.  I continued asking the child like what kind of clothes had you had on or if you knew where it happened or anything.  She said she would have her clothes on but he would pull her underpants down, and when I asked what her father had on, she said he had his clothes on with holes in his underwear, and that's when she would see a penis, his 'wee wee.'  There was another child that's involved, and she said that she had witnessed this happening to the other child, and this child was present when it happened to her.

"* * * *

"A.   Okay.  She just stated that he, her father, also wanted to have his penis put in her mouth, but she didn't want that ever to happen.  She would say no.  She would say that he would kiss her on the lips, but only her lips.  On her body, she would squirm, 'cause she didn't like it.  She said her father would tell her to tell the truth but ask her to lie about this, that she wasn't allowed to tell the truth about this.  There was concerns of x-rated movies being played, and she told me about x-rated movies, but don't know what it actually meant.  She very freely showed me—the dolls were on the table, and we weren't really doing anything with them.

"* * * *  she showed me what a man doll on top of the male doll, and said that is what that is on a female doll, on top of the other female doll.  She said she had watched these x-rated movies with her father.

"* * * *

"A.   She showed me the male doll on top of the female doll and said at this point this is what my dad does to me too, and she said it happened in the dark, and I couldn't clarify who else was there, if another child was there on her or not.  She said other people were home, but they are sleeping."

Stutz, who received the case from Russell, testified that on January 18, 1989, Shane made the following statements to her:

"A.   He had been afraid to tell the truth about what had happened between him and his father, and he told me he was ready to talk about.

"Q.   Did he indicate what the source of his fear or the nature of his fear or why he was afraid, let me put it that way?

"A.   I don't know specifically why he was afraid.  It's my impression that he, like other children, was afraid to tell the truth because of what might happen to him in the nature of the abuse.

"Q. All right. What did he tell you?

"A. He told me that his father put his 'pee pee' in his butt and touched his genitals. That was the extent of the abuse. He told me that it happened—he didn't say the—how many times it's happened, I'm sorry.

"Q. He did not say—

"A. At that time how many times it happened.

"Q. Did he elaborate at any time in the future beyond that time?

"A. I believe he said it happened a couple of times at the time that it was happening.

"Q. All right. Was he able to give you any indication as approximately what conduct took place?

"A. Yes, he did. He said that it happened approximately November 25th or 26th. I believe it was at the time just prior to Shane and his father leaving for Florida."

Stutz also testified that appellant had had criminal charges filed against him and had stood trial based upon allegations of sexual abuse of Shane, Theresa and another child, and that a jury had found him guilty of three counts of rape and two counts of sexual imposition. At that time the trial court took judicial notice of two judgment entries of sentence which indicated that on February 12, 1990, appellant was sentenced to incarceration for a period of fifteen to twenty-five years on the three counts of rape and for a period of four to ten years on the two counts of gross sexual imposition, all of which were to be served consecutively.

Finally, appellant himself testified denying that he had ever sexually molested Shane or Theresa. He also acknowledged that he had been convicted and sentenced for approximately fifty-seven to ninety-seven years on sexual offenses involving Shane, Theresa and one other child.

At the conclusion of the hearing the referee entered a finding that Shane and Theresa were dependent, neglected and abused children. The dispositional hearing then began on February 14, 1990 and concluded on February 16, 1990. Testifying at that hearing were John Brikmanis, Terrence Scully, Mollie Stutz, Eileen Rude and William Gill. Brikmanis, a clinical psychologist and testing and evaluation specialist with the East Center for Community Mental Health, testified as to his psychological evaluation of Patricia Walker, who had been referred to him by appellee, and his evaluation of her parenting ability. Scully, also a clinical psychologist, testified as to his evaluation of appellant who had been referred to him by appellee for clinical interview and evaluation and for joint therapy with Shane and Theresa. Stutz then testified extensively as to her involvement with Theresa and Shane and their parents

since December of 1988. Eileen Rude, a social worker with Cummings–Zucker then testified as to her assessment of Theresa, Shane and Patricia Walker and the services and programs provided to them. Finally, Gill testified that he was Shane's father and that he desired to establish paternity and have custody of him, and as to his contact with appellee.

On March 12, 1990, the referee filed her report dated February 16, 1990, which set forth her findings of fact as to adjudication and disposition and concluded that Shane and Theresa were dependent, neglected and abused, and recommended that permanent custody be awarded to appellee. Subsequently, Walker, appellant and Gill each filed objections to the referee's report and on May 9, 1990, a hearing was held before a judge on the objections. On May 24, 1990, the trial court filed its judgment entry in which it found all the objections not well-taken, affirmed the referee's findings and recommendations and awarded permanent custody of Shane and Theresa to appellee. It is from this order that appellant brings this appeal.

In his first assignment of error appellant asserts that at the adjudication hearing, the trial court erred by, over appellant's objections, permitting Dr. Farrar, Mollie Stutz, and Cecilie Russell to testify as to statements made to them by Shane and Theresa describing how appellant had sexually abused them.

■ As to Dr. Farrar's testimony, Evid.R. 803 provides in pertinent part: "RULE 803. Hearsay Exceptions; Availability of Declarant Immaterial.

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

"* * *

"4. Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

It is clear that the hearsay statements made by Shane to Dr. Farrar qualify under Evid.R. 803(4) and, therefore, the trial court did not err in admitting that testimony over appellant's objection.

■ As to the statements made by Shane and Theresa to Russell and Stutz, this court finds that, while they do not qualify under Evid.R. 803(4) because they were made to social workers and not to medical personnel for diagnosis or treatment, their admission into evidence was not prejudicial to appellant but merely cumulative to the testimony of the two clinical therapists, Smith and Johnson, admitted without objection by appellant, and the undisputed evidence

of appellant's conviction on charges of rape and gross sexual imposition involving Share and Theresa. Accordingly, their admission was harmless error and appellant's first assignment of error is found not well taken.

In his second assignment of error, appellant asserts that he was denied due process of law by the failure of the trial court to enter judgment within seven days after conclusion of the dispositional hearing in violation of Juv.R. 34(C).[2] Appellant points out that in this case almost a full month elapsed between the conclusion of the dispositional hearing and the filing of the referee's report and over two months more elapsed before the final judgment entry adopting the referee's report was filed. Appellant submits that the language of Juv.R. 34(C) is clearly mandatory and requests that this court find that the violation of the seven-day requirement of Juv.R. 34(C) resulted in a denial of his right to due process and entitles him to a reversal of the trial court's decision awarding permanent custody of Theresa and Shane to appellee.

Appellee responds that Juv.R. 34(C) is merely directory, not mandatory, in permanent custody cases and that it is impossible and against public interest to require the trial court to make its decision within seven days after the hearing.

In support of their respective arguments both parties cite to prior decisions of this court which conflict in their application of the seven day requirement of Juv.R. 34(C) and R.C. 2151.35(B)(3), amended effective January 1, 1989,[3] and determination as to whether that rule is mandatory or directory. Although, due to the time frames involved, R.C. 2151.35(B)(3) as amended effective January 1, 1989, is not directly applicable to the facts of this case, Juv.R. 34(C), which is mirrored by R.C. 2151.35(B)(3), is, and a consideration of both will be helpful in resolving the inconsistency in this court's previous decisions in *In re Hogan* (Nov. 16, 1990), Lucas App. No. L-89-259, unreport-

---

**2.** Juv.R. 34(C) provides:

"Judgment. After the conclusion of the hearing, the court shall enter an appropriate judgment within seven days. A copy of the judgment shall be given to any party requesting such copy. In all cases where a child is placed on probation, the child shall receive a written statement of the conditions of probation. If the judgment is conditional, the order shall state the conditions. If the child is not returned to his own home, the court shall determine which school district shall bear the cost of his education and may fix an amount of support to be paid by the responsible parent, or to be paid from public funds."

**3.** R.C. 2151.35(B)(3), effective January 1, 1989, provides in pertinent part:

"After the conclusion of the dispositional hearing, the court shall enter an appropriate judgment within seven days and shall schedule the date for the hearing to be held pursuant to section 2151.415 of the Revised Code. The court may make any order of disposition that is set forth in section 2151.353 of the Revised Code. A copy of the judgment shall be given to each party and to the child's guardian ad litem. If the judgment is conditional, the order shall state the conditions of the judgment."

ed, 1990 WL 178092 and *In re Rodgers* (Nov. 30, 1990), Lucas App. No. L–90–115, unreported, 1990 WL 187334.

In *Hogan* the appellant raised as error several violations by the trial court of the procedural requirements set forth in R.C. Chapter 2151, as amended effective January 1, 1989, and the Juvenile Rules, including a violation of the seven-day requirement set forth in R.C. 2151.35(B)(3) and Juv.R. 34(C). In *Hogan*, the adjudicatory and dispositional hearings, which were held before a trial judge, concluded on July 14, 1989 and the trial judge issued his final judgment on August 11, 1989. In *Hogan*, this court found that the seven-day requirement set forth in both R.C. 2151.35(B)(3) and Juv.R. 34(C), as applicable therein, was mandatory. The *Hogan* court reversed the final judgment of the trial court on the basis of the trial court's failure to comply with that and other mandatory procedural requirements and remanded the case for new adjudicatory and dispositional hearings. Custody was ordered to remain in Lucas County Children Services Bureau pending those hearings.

In *Rodgers*, the appellant raised as error the failure of the trial court to observe the requirements of R.C. 2151.35(B)(3). There the dispositional hearing was held before a referee and concluded on November 13, 1989. The referee's report was filed on December 15, 1989, and on December 29, 1989 and January 3, 1990 objections to the report were filed. On February 7, 1990 the trial court held a hearing on the objections and on February 27, 1990 issued its final judgment entry. In *Rodgers*, this court determined that a review of all of the evidence by the referee, the preparation of the findings and recommendations required by Juv.R. 40(D) and the submission of those to the trial judge for final decision, all within seven days, was a "virtual impossibility." This court found in that case that, upon examination of the evidence and the record, the three-month delay in issuing final judgment was not prejudicial to appellant.

It is obvious from the foregoing that the court should reexamine its decision in *Hogan* and *Rodgers*, and review and reconsider the question of whether the seven-day provision of Juv.R. 34(C) and R.C. 2151.35(B)(3) is mandatory or merely directory.

While the Juvenile Rules were enacted pursuant to Article IV of the Ohio Constitution to establish a uniform procedure for the courts of Ohio, they do not affect the jurisdiction of the juvenile courts as established by statute. *Linger v. Weiss* (1979), 57 Ohio St.2d 97, 11 O.O.3d 281, 386 N.E.2d 1354; Juv.R. 1(A).

The stated purpose of R.C. Chapter 2151 is to, among other things, provide for the care, protection, and mental and physical development of children and to provide judicial procedures in which the parties are assured of a fair

hearing and of having their constitutional and other legal rights enforced. R.C. 2151.01(A) and (D).

Preliminarily we note that in both R.C. 2151.35(B)(3) and Juv.R. 34(C), the word "shall" is used in reference to the seven-day requirement. Appellant urges this court to find the seven-day requirement in Juv.R. 34(C) mandatory while appellee urges this court to find that requirement as merely directory.

■ The word "shall" is usually interpreted to make the provision in which it is found mandatory, while the word "may" is generally construed as optional, permissive or discretionary. *Dorrian v. Scioto Conserv. Dist.* (1971), 27 Ohio St.2d 102, 107, 56 O.O.2d 58, 60, 271 N.E.2d 834, 837. Ordinarily, the two words are not used interchangeably or synonymously. *Id.* In order to determine and give effect to legislative intent it is sometimes necessary to give those words as used in a statute meanings different from those given them in ordinary usage. *Id.* In order for one to have the meaning of the other, however, such intent must appear from a general view of the particular statute involved. *Id.* at 108, 56 O.O.2d at 61, 271 N.E.2d at 838.

■ When reviewing the specific language of R.C. 2151.35(B)(3), we find that it is clear and definite in its meaning and that it is unnecessary to resort to any construction or interpretation to ascertain if the word "shall" was really intended by the legislature to mean "may". See, generally, *Sears v. Weimer* (1944), 143 Ohio St. 312, 28 O.O. 270, 55 N.E.2d 413; *Wingate v. Hordge* (1979), 60 Ohio St.2d 55, 14 O.O.3d 212, 396 N.E.2d 770. Upon consideration thereof, this court finds that the seven-day time requirement of R.C. 2151.35(B)(3) is clearly mandatory and must be applied as stated. For the same reason we find that the corresponding provision of Juv.R. 34(C) is also clear and definite and mandates compliance with its seven-day time limit.

Even assuming, for the sake of argument, that some ambiguity existed in the statutory provision as to the meaning to be accorded to the word "shall," thus requiring interpretation and determination of the legislative intent, it is clear from our review of R.C. Chapter 2151, as amended, that the intent of the legislature was to expedite all stages of these proceedings by imposing strict temporal requirements where none existed previously, with the exception of Juv.R. 34(C). The imposition of such rigid time requirements surely is consistent with the important rights involved in these proceedings, specifically, parental rights, the emotional and physical well-being of children, and the need for expeditious resolution in order to stabilize the child's environment, especially crucial where permanent termination of parental rights is sought for adoptive purposes. Clearly, there is no view of the statute that supports

the conclusion that the legislature intended the seven day requirement of R.C. 2151.35(B)(3) to be merely directory despite the use of the word "shall".

Finally, R.C. 1.47(D) provides:

"In enacting a statute, it is presumed that:

" * * *

"(D) a result feasible of execution is intended."

It is the province of the legislature and those involved in enacting statutory provisions, and by the same token the Supreme Court of Ohio and those involved in enacting the Rules of Juvenile Procedure, to determine what is or is not feasible or possible. A court may not rewrite a particular provision on the basis that it is improving that provision, but rather, it is limited to the application of the plain language thereof, or construction or interpretation only *where necessary.* See, generally, 85 Ohio Jurisprudence 3d (1988) 166, Statutes, Sections 176 to 198; *Seeley v. Expert, Inc.* (1971), 26 Ohio St.2d 61, 55 O.O.2d 120, 269 N.E.2d 121.

In light of all of the foregoing, and upon reevaluation of our decisions in *Hogan* and *Rodgers,* we conclude that the seven-day requirement set forth in R.C. 2151.35(B)(3) and Juv.R. 34(C) is clearly mandatory and must be applied as such and not relaxed or eliminated by this court. By determining, in *Rodgers* that application of a seven-day requirement was a "virtual impossibility," and by applying, instead, a subjective standard of determining what time frame was reasonable depending upon the particular facts of that case, we clearly were invading the province of the legislature and, in fact, rewriting the provision.

Upon consideration of the foregoing, we hereby overrule that part of our decision in *Rodgers* which is inconsistent with our decision herein. After careful consideration we also find that the seven-day rule can be applied consistently with Juv.R. 40(D) which mandates the preparation and filing of findings of fact and recommendations by the referee, provides an allowance of fourteen days from the filing of the referee's report for the filing of objections by the parties, and provides for a hearing on the objections. Specifically, our interpretation of Juv.R. 34(C) and R.C. 2151.35(B)(3) in this regard is as follows. When the dispositional hearing is conducted before a referee, the referee has seven days from the time the case becomes decisional in which to issue its findings of fact and recommendations. At the expiration of the fourteen-day period for filing objections, if no objections are filed, the case is decisional and the trial judge has seven days to issue its final judgment. If objections are filed pursuant to Juv.R. 40 and a hearing is held the judge has seven days from the conclusion of the hearing to enter its final

judgment. Where, as in *Hogan,* the dispositional hearing is held before the trial judge, the trial judge has seven days from the conclusion of that hearing to issue its final judgment.

█ Having determined, therefore, that the seven-day requirement set. forth in R.C. 2151.35(B)(3) and Juv.R. 34(C) is mandatory, we must now determine whether or not reversal of the trial court's decision in this case is required as a result of its failure to comply with that requirement.

Upon consideration thereof, this court finds that, (1) while the trial court did err in not complying with Juv.R. 34(C), that error did not result in a denial of appellant's right to due process of law; (2) the trial court's failure to meet the mandatory time requirement of Juv.R. 34(C) does not deprive it of jurisdiction to enter a final determination even though rendered outside of those time requirements, *Weiss, supra;* and (3) reversal of the trial court's final judgment is not the proper remedy. To the extent that our decision in *Hogan, supra,* is inconsistent with this ruling, in that we did reverse the trial court's decision and remand the case for new adjudicatory and dispositional hearings, that decision is also overruled.[4] This court finds further, that the proper remedy in cases such as this, where a trial court fails to meet the seven-day requirement imposed by R.C. 2151.35(B)(3) and/or Juv.R. 34(C), would be for any interested party to file, upon expiration of the seven-day time period, a petition for a writ of procedendo with this court requesting us to direct the trial court to comply immediately with those requirements and proceed to final judgment, and this court will as expeditiously as possible fully consider such request.

Accordingly, appellant's second assignment of error is found not well taken.

Upon consideration whereof, this court finds that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed.

*Judgment affirmed.*

GLASSER and SHERCK, JJ., concur.

---

**4.** We note, however, that in *Hogan,* the trial court's final decision was reversed and remanded also based upon that court's failure to follow the mandatory procedures set forth in R.C. 2151.419 requiring that certain determinations be made at the adjudicatory hearing and that written findings of fact setting forth these determinations be filed. In determining in this case that reversal and remand of the trial court's final judgment for failure to comply with the seven-day requirement for entering final judgment is not the proper remedy, and reversing *Hogan* on those grounds we are not reversing our decision in *Hogan* as to the other issues involved therein.